Anne DUNLAP, Deborah Dunlap, and James Dunlap, Plaintiffs Below, Appellants,

v.

STATE FARM FIRE AND CASUALTY COMPANY, Defendant Below, Appellee.

No. 288,2004.

Supreme Court of Delaware.

Submitted: Dec. 10, 2004.
Decided: July 5, 2005.
Corrected: July 13, 2005.

---

7. D.R.E. 609(d).

James J. Woods, Jr., Esq., of Sullivan and Woods, LLC, Wilmington, Delaware, for Appellants.

Daniel V. Folt, Esq. (argued), and Gary W. Lipkin, Esq., of Duane Morris LLP, Wilmington, Delaware, for Appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices, constituting the court en banc.

BERGER, Justice.

In this appeal, we consider whether, with respect to automobile insurance policies, the implied covenant of good faith and fair dealing encompasses claims other than for "bad faith" in denying or delaying payment of benefits. Anne Dunlap, the insured, suffered catastrophic injuries in a car accident. She asked State Farm Fire and Casualty Company, her underinsured motorist (UIM) insurer, to agree that it would not deny coverage if she settled with a potential tortfeasor whose liability was questionable. State Farm refused, thereby causing Dunlap to litigate her claim against the tortfeasor (unsuccessfully) and lose more than $175,000. Dunlap sued State Farm, alleging that it acted in bad faith. The Superior Court dismissed her complaint, with prejudice. We agree that the complaint does not allege a bad faith claim for delay or denial of insurance, since it does not charge State Farm with failure to investigate, process, or pay a claim without reasonable justification. The complaint, however, does allege facts suggesting that State Farm breached the implied covenant of good faith and fair dealing by depriving Dunlap of a third party recovery without any justification and without any potential financial exposure. Accordingly, we remand with instructions to enter an order dismissing without prejudice, giving Dunlap the right to replead, if she can, in accordance with the principles discussed in this decision.

Factual and Procedural Background

On August 7, 1998, Anne Dunlap was a passenger in Mark Cardillo's car when he made a left turn in front of a Delaware Transit Corporation (DART) bus. The bus collided with the car, striking the passenger door. Anne suffered severe and permanent injuries that left her partially paralyzed. She incurred hundreds of thousands of dollars in medical expenses.

In August 2000, Anne and her parents filed suit against Cardillo, DART, and Monte Wood, the bus driver. The Dunlaps had a policy with State Farm that provided $1 million in UIM coverage. The policy covering Cardillo's car had a single liability limit of $500,000, and DART had a single liability limit of $300,000. Cardillo's insurer paid the Dunlaps and the other injured parties the limits of its coverage almost immediately in light of the seriousness of the injuries and its insured's probable liability. DART contested liability, but nevertheless, following August 2001 negotiations, offered to settle with the Dunlaps for $175,000.

The Dunlaps, worried about jeopardizing their UIM coverage, wrote to State Farm seeking assurance that if they settled for less than the DART policy limits, without exhausting "all bodily injury bonds and insurance policies available," they would not be denied underinsurance benefits:

> In my opinion, the Cardillo vehicle is an "underinsured motor vehicle," as defined [by Delaware law], regardless of whether any settlement with DART exhausts DART's $300,000 limit. I would like to have State Farm's agreement that the Dunlaps may settle with DART for less than $300,000 without prejudicing the Dunlaps' UIM claim. Of course, I will not assert that the DART bus is

an "underinsured motor vehicle" unless we exhaust the $300,000 coverage.[1]

The Dunlaps wrote similar letters the following month, noting that Anne was hemiplegic and had already incurred more than $500,000 in medical expenses.[2] In December 2001, State Farm refused to agree to the Dunlaps' proposal. Citing the Dunlaps' obligation to exhaust all applicable tortfeasor policies before pursuing a UIM claim, State Farm responded that it was "not aware [of] any authority in this state for the proposition that you've asked State Farm to accept." [3]

The Dunlaps proceeded to trial against DART, Wood, and Cardillo. The jury found Cardillo solely liable and exonerated DART and Wood. Shortly thereafter, State Farm paid the Dunlaps the $1 million UIM coverage limit. The Dunlaps then filed suit against State Farm, asserting that State Farm had breached its policy in "bad faith" when it refused to consent to their request to settle with DART for less than the DART policy limits. The Dunlaps alleged that State Farm's refusal forced them to trial against DART despite improbable liability and despite overwhelming damages unquestionably resulting from the accident. As a result, the Dunlaps lost the $175,000 DART had been willing to pay to avoid trial, and were forced to incur attorneys' fees and other trial-related expenses.

State Farm moved to dismiss the complaint for failure to state a claim. The trial judge granted its motion, holding:

> It was not [State Farm's] responsibility to sanction the negotiations, nor was it a requirement that it administer advice or exercise influence with regard to [the Dunlaps'] decision to accept the settlement or to litigate. [The Dunlaps] have attempted to shift the onus of an unsuccessfully construed course of action, and/or trial strategy, onto [State Farm], whose statutory obligation had not yet been triggered at the time of settlement negotiations.[4]

The trial judge reasoned that the statutory exhaustion requirement, as well as the identical policy terms, provided a reasonable justification for State Farm's conduct and that State Farm had neither unreasonably delayed nor refused payment of its UIM coverage limits. Therefore, the Dunlaps had not alleged a "bad faith" claim in their complaint.[5] This is the Dunlaps' appeal.

## Discussion

The Court reviews judgments on a motion to dismiss *de novo*.[6] In this context, we determine whether the trial judge erred as a matter of law in formulating or applying legal precepts.[7] Dismissal

---

1. Letter from James J. Woods, Jr., Esq., to Maude I. Niedzielski (Sept. 18, 2001), *citing* 18 *Del. C.* § 3902(b)(2) (emphasis removed), Appellants' Appendix, A–000002.

2. *See* Letter from James J. Woods, Jr., Esq., to Maude I. Niedzielski (Oct. 22, 2001) (ending: "I sincerely hope that State Farm will 'take the high road' and not obstruct the proposed DART–Dunlap settlements."), Appellants' Appendix, A–000003–4; Letter from James J. Woods, Jr., Esq., to Colin M. Shalk, Esq. (Nov. 13, 2001), Appellants' Appendix, A–000005–6.

3. Letter from Colin M. Shalk, Esq., to James J. Woods Jr., Esq. (Dec. 18, 2001), Appellants' Appendix, A–000008–9.

4. *Dunlap v. State Farm Fire & Cas. Co.*, 2004 WL 1427001, at *6, 2004 Del.Super. LEXIS 188, at *24.

5. *Id.* at *8–9, 2004 Del.Super. LEXIS 188, at *32–33.

6. *See, e.g., VLIW Tech. LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 610 (Del.2003).

7. *Gadow v. Parker*, 865 A.2d 515, 518 (Del. 2005).

is warranted only if "it appears with reasonable certainty" that the claims asserted would not entitle plaintiff to relief under any provable set of facts.[8] But we need not "blindly accept as true all allegations, nor must [we] draw all inferences from them in [plaintiff's] favor unless they are reasonable inferences."[9]

Before we consider the implied covenant of good faith and fair dealing, we address the two issues that controlled the trial court's decision—the meaning of the statutory exhaustion requirement, and the elements of a so-called bad faith insurance claim.

### A. The Exhaustion Requirement

This Court has considered the correct construction and application of Delaware's uninsured/underinsured motorist (UIM) statute, 18 *Del. C.* § 3902, many times.[10] The statute provides, in relevant part:

(b) Every insurer shall offer to the insured the option to purchase additional coverage for personal injury or death up to a limit of $100,000 per person and $300,000 per accident .... Such additional insurance shall include underinsured bodily injury liability coverage.

(1) Acceptance of such additional coverage shall operate to amend the policy's uninsured coverage to pay for bodily injury damage that the insured ...[is] legally entitled to recover from the driver of an underinsured motor vehicle.

(2) An underinsured motor vehicle is one for which there may be bodily injury liability coverage in effect, but the limits of bodily injury liability coverage under all bonds and insurance policies applicable at the time of the accident total less than the limits provided by the uninsured motorist coverage....

(3) The insurer shall not be obligated to make any payment under this coverage until after the limits of liability under all bodily injury bonds and insurance policies available to the insured at the time of the accident have been exhausted by payment of settlements or judgments....

■ The overriding purpose of § 3902 is to "fully compensate innocent drivers."[11] Thus, when construing ambiguous portions of the statute, this Court has adopted interpretations that maximize the accident victim's opportunity to be fully compensated. Notwithstanding the goal of full compensation, this Court has limited the insured's recovery in circumstances where the statutory language clearly mandated that result. Thus, for example, an insured may not stack policies to determine whether the tortfeasor's vehicle meets the § 3902(b)(2) definition of an underinsured motor vehicle.

■ The trial court applied settled rules of statutory construction and properly concluded that the exhaustion provision, § 3902(b)(3), is clear and unambiguous. The plain meaning of the provision is that UIM carriers are not obligated to pay their insureds until after the insureds ex-

---

8. *See, e.g., McMullin v. Beran,* 765 A.2d 910, 916 (Del.2000).

9. *White v. Panic,* 783 A.2d 543, 549 (Del. 2001) (citation omitted).

10. *See, e.g.: Deptula v. Horace Mann Ins.Co.,* 842 A.2d 1235 (Del.2004); *Colonial Ins. Co. of Wisconsin v. Ayers,* 772 A.2d 177 (Del. 2001); *Nationwide Mut. Auto. Ins. v. Peebles,*

688 A.2d 1374 (Del.1997); *Sutch v. State Farm Mut. Auto. Ins. Co.,* 672 A.2d 17 (Del. 1996); *Hurst v. Nationwide Mut. Ins. Co.,* 652 A.2d 10 (Del.1995); *Home Ins. Co. v. Maldonado,* 515 A.2d 690 (Del.1986).

11. *Deptula v. Horace Mann Ins. Co.,* 842 A.2d at 1237.

haust all available liability insurance policies. Thus, State Farm was not obligated to pay the Dunlaps before the Dunlaps either received a policy limits settlement from DART or obtained a judgment after trial.[12]

### B. Bad Faith Refusal to Pay

In *Tackett v. State Farm Fire & Cas. Ins. Co.*,[13] this Court held that a first-party claim against an insurer for bad faith denial or delay in claim payments sounds in contract and arises from the implied covenant of good faith and fair dealing.[14] *Tackett* defined the elements of a bad faith insurance claim:

> Where an insurer fails to investigate or process a claim or delays payment in bad faith, it is in breach of the implied obligations of good faith and fair dealing underlying all contractual obligations.... A lack of good faith, or the presence of bad faith, is actionable where the insured can show that the insurer's denial of benefits was "clearly without any, reasonable justification."[15]

The Dunlaps' complaint does not fit neatly within the above-described rubric, as it does not allege that State Farm failed to investigate or pay a claim. What the complaint does accuse State Farm of is a "bad faith" refusal to cooperate, which the trial court treated as a bad faith "refusal to pay" claim. It is in that context that we turn briefly to State Farm's contentions.

State Farm argues that its reliance on the "exhaustion" statute, even if misplaced, defeats a bad faith claim. State Farm points out that a bad faith claim requires a showing that its decision lacked any reasonable justification. Here, State Farm says, it relied on the plain language of a statute, which constituted "reasonable justification" as a matter of law. Moreover, and in addition, State Farm asked the Dunlaps to provide Delaware authority supporting their position, and the Dunlaps did not reply. Accordingly, State Farm concludes, there are no facts that could establish that it acted unreasonably.

We agree that, under settled Delaware law, the Dunlaps' complaint does not state a cause of action for a bad faith refusal to pay insurance claim because the complaint does not allege an unjustified failure or delay in the processing or payment of an insurance claim. The question is whether State Farm's refusal to cooperate, under the facts of this case, could be actionable as a breach of the implied covenant of good faith and fair dealing on a different basis. We find, for the reasons next set forth, that it could be.

### C. The Insurer's Implied Covenant of Good Faith and Fair Dealing

■ The requirement that all parties to an insurance contract act in "good faith" toward one another spans at least three centuries of American legal thought.[16] By

---

**12.** The Dunlaps point out that this construction requires insureds to "pursue claims of weak liability against third parties, thereby fostering marginal and costly litigation...." *General Acc. Ins. Co. v. Wheeler*, 221 Conn. 206, 603 A.2d 385, 388 (1992). The Connecticut Supreme Court, citing those concerns, construed a UIM statute like ours to mean that the insured must exhaust only one tortfeasor's liability coverage before seeking UIM benefits. *Ibid.* Although we recognize this policy issue, it is not our function to construe a statute that is clear and unambiguous. If

any changes to the UIM statute are deemed necessary, it is the General Assembly that must effect those changes.

**13.** 653 A.2d 254 (Del.1995).

**14.** *Id.* at 264.

**15.** *Id.* at 264 (citing *Casson v. Nationwide Ins. Co.*, 455 A.2d 361, 369 (Del.Super.1982)).

**16.** *See, e.g., Goix v. Low*, 1 Johns.Cas. 341, 352 (N.Y.1800) ("A rigorous attention to the

the twentieth century, courts and commentators clarified the doctrine, steadily referring to the newly-coined "implied covenant of good faith and fair dealing."[17] Despite its evolution, the term "good faith" has no set meaning, serving only to "exclude a wide range of heterogeneous forms of bad faith."[18] The covenant is "best understood as a way of implying terms in the agreement,"[19] whether employed to analyze unanticipated developments[20] or to fill gaps in the contract's provisions.[21] Existing contract terms control, however, such that implied good faith cannot be used to circumvent the parties' bargain,[22] or to create a "free-floating duty...unattached to the underlying legal document."[23] Thus, one generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement.[24] Recognized in many areas of the

purest rules of good faith is exacted from all the parties to a contract of insurance."); *Pine v. Vanuxem*, 3 Yeates 30, 33 (Pa.1800) ("Insurances are contracts of indemnity; they should be entered into and fulfilled with the purest good faith."); *Eichelberger v. Barnitz*, 1 Yeates 307 (Pa.1793) ("In a policy of insurance, where the most pure good faith is required, it is settled, that the insured need not mention what the underwriter ought to know."). *Cf. Seton, Maitland & Co. v. Low*, 1 Johns. Cas. 1, 6 (N.Y.1799) ("[T]he reason of the rule requiring due disclosure of all facts, within the knowledge of either party, is to prevent fraud and encourage good faith....").

17. *See, e.g., Blish v. Thompson Automatic Arms Corp.*, 64 A.2d 581 (Del.1948); *Wood v. Lucy, Lady Duff–Gordon*, 222 N.Y. 88, 118 N.E. 214 (1917); *Heney v. Sutro & Co.*, 28 Cal.App. 698, 153 P. 972 (1915); *Germania Ins. Co. v. Rudwig*, 80 Ky. 223 (1882). *See also* Eric M. Holmes, *A Contextual Study of Commercial Good Faith: Good Faith Disclosure in Contract Formation*, 39 U. Pitt. L. Rev. 381 (1978) (tracing covenant's Roman roots); J.F. O'Connor, Good Faith in International Law (1991) (same).

18. Robert S. Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code*, 54 Va. L. Rev. 195, 201 (1968).

19. *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del.1996), *citing* E. Allan Farnsworth, *Good Faith Performance and Commercial Reasonableness under the Uniform Commercial Code*, 30 U. Chi. L. Rev. 666, 670 (1963).

20. *Pressman*, 679 A.2d at 443.

21. *Glenfed Fin. Corp., Commercial Fin. Div. v. Penick Corp.*, 276 N.J.Super. 163, 647 A.2d 852, 858 (1994) (citations omitted) ("When the contract is silent, principles of good faith ... fill the gap.").

22. *Rudbart v. North Jersey Dist. Water Supply Comm'n*, 127 N.J. 344, 605 A.2d 681, 692 (1992), *cert. denied*, 506 U.S. 871, 113 S.Ct. 203, 121 L.Ed.2d 145. *See also Hall v. Resolution Trust Corp.*, 958 F.2d 75, 79 (5th Cir. 1992) ("An agreement made by the parties and embodied in the contract itself cannot be varied by an implicit covenant of good faith and fair dealing."), *quoting Exxon Corp. v. Atlantic Richfield Co.*, 678 S.W.2d 944, 947 (Tex.1984); *Terry A. Lambert Plumbing Inc. v. Western Sec. Bank*, 934 F.2d 976, 983 (8th Cir.1991) ("Acting according to express terms of a contract is not a breach of good faith and fair dealing."); *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir.1990) ("Any attempt to add an overlay of 'just cause' ... to the exercise of contractual privileges [based on the UCC's requirement of 'honesty in fact'] would reduce commercial certainty and breed costly litigation."); *Price v. Wells Fargo Bank*, 213 Cal.App.3d 465, 479, 261 Cal.Rptr. 735 (1989) (holding the duty of good faith and fair dealing "does not impose any affirmative duty of moderation in the enforcement of legal rights.").

23. *Glenfed Fin. Corp.*, 647 A.2d at 858.

24. *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 975 F.Supp. 584, 616 (D.N.J. 1996). *See also Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 617 (3d Cir.1995) ("[C]ourts generally utilize the good faith duty as an interpretive tool to determine the parties' justifiable expectations, and do

law,[25] the implied covenant attaches to every contract,[26] including contracts of insurance.[27]

Stated in its most general terms, the implied covenant requires "a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits" of the bargain.[28] Thus, parties are liable for breaching the covenant when their conduct frustrates the "overarching purpose" of the contract by taking advantage of their position to control implementation of the agreement's terms.[29] This Court has recognized "the occasional necessity" of implying contract terms to ensure the parties' "reasonable expectations" are fulfilled.[30] This quasi-reformation, however, "should be [a] rare and fact-intensive" exercise, governed solely by "issues of compelling fairness." [31] Only when it is clear from the writing that the contracting parties "would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter" may a party invoke the covenant's protections.[32]

As noted earlier, the implied covenant of good faith and fair dealing doctrine applies to insurance contracts. But, in that context, the case law frequently (and unfortunately) equates a lack of good faith with the presence of bad faith,[33] and the parameters of an action for "bad faith" refusal to pay insurance proceeds are well settled.[34] Thus, in this case, State Farm's refusal to cooperate with the Dunlaps did not subject it to liability for bad faith, because its conduct did not involve the failure or refusal to pay an insurance claim. Moreover, even if this were deemed to be a failure-to-pay case, State

---

not enforce an independent duty divorced from the specific clauses of the contract.") (quotation marks omitted).

**25.** *See, e.g., Desert Equities Inc. v. Morgan Stanley Leveraged Equity Fund II LP,* 624 A.2d 1199, 1208 n. 16 (Del.1993) (limited partnerships); *Merrill v. Crothall–American Inc.,* 606 A.2d 96, 101 (Del.1992) (employment contracts); *Simons v. Cogan,* 542 A.2d 785, 787 (Del.Ch.1987) (corporate-bond indenture); *Gilbert v. El Paso Co.,* 490 A.2d 1050, 1054–55 (Del.Ch.1984) (tender offer); *Jedwab v. MGM Grand Hotels Inc.,* 509 A.2d 584, 596 (Del.Ch. 1986) (preferred-stock preferences).

**26.** *Merrill,* 606 A.2d at 101; *Blish v. Thompson Automatic Arms Corp.,* 64 A.2d 581, 597 (Del.1948).

**27.** *Pierce v. International Ins. Co.,* 671 A.2d 1361, 1366 (Del.1996); *Corrado Bros. v. Twin City Fire Ins. Co.,* 562 A.2d 1188, 1192 (Del. 1989); *Polito v. Continental Cas. Co.,* 689 F.2d 457, 463 (3rd Cir.1982). .

**28.** *Wilgus v. Salt Pond Inv. Co.,* 498 A.2d 151, 159 (Del.Ch.1985), *construing* Restatement § 205.

**29.** *Breakaway Solutions, Inc. v. Morgan Stanley & Co.,* 2004 WL 1949300, at *12, 2004 Del. Ch. LEXIS 125, at *49–50.

**30.** *See, e.g., Pressman,* 679 A.2d at 443; *Cincinnati SMSA Ltd. Pshp. v. Cincinatti Bell Cellular Sys. Co.,* 708 A.2d 989, 992 (Del. 1998) ("Delaware Supreme Court jurisprudence is developing along the general approach that implying obligations based on the covenant . . . is a cautious enterprise.").

**31.** *Cincinnati,* 708 A.2d at 992–93; *Wilmington Trust Co. v. Keith,* 2002 WL 1748622 at *2, 2002 Del.Super. LEXIS 445 at *6 (echoing "cautious enterprise" language).

**32.** *Katz v. Oak Industries, Inc.,* 508 A.2d 873, 880 (Del.Ch.1986).

**33.** *Tackett,* 653 A.2d at 264.

**34.** "The law governing the insurer's liability for bad faith has evolved from an undefined, vague set of threats into a relatively mature body of settled rules and accepted goals." Kenneth S. Abraham, *The Natural History of the Insurer's Liability for Bad Faith,* 72 Tex. L. Rev. 1295, 1315 (1994).

Farm reasonably relied on the exhaustion provision. The question thus becomes whether the scope of the duty arising out of the covenant of good faith and fair dealing is limited to the insurance company's obligation to fairly and promptly process and pay its insured's claims.

The answer to that question is no. State Farm learned the answer to that question in a case decided in another jurisdiction. In *Schwartz v. State Farm Fire and Casualty Company*,[35] two people were seriously injured by an uninsured motorist. Andrew Schwartz, one of the injured, had a primary policy with another insurance company, and a $2 million umbrella policy with State Farm. The excess policy "applied only when ... there is payment by your underlying coverage."[36] Elliot Weinstein, the other injured party, was covered by Schwartz's policies because he was a passenger in Schwartz's car. Both men submitted demands for policy limits to the primary insurer and State Farm. Weinstein obtained full payment from the primary insurer, and concluded his arbitration with State Farm before Schwartz. Without notifying Schwartz, State Farm paid Weinstein approximately $1.5 million of the $2 million in available excess coverage. A few months later, when Schwartz received full payment from the primary insurer, he notified State Farm and was paid the remaining $471,960.

Schwartz sued State Farm, alleging that State Farm knew "to a reasonable degree of certainty" that the two claims would exceed all available policy limits but failed to take any steps to protect Schwartz's claim.[37] State Farm argued that it had no duty to Schwartz until such time as the primary insurance was exhausted, and that it complied with its duty to pay as soon as the exhaustion requirement was satisfied. The Schwartz court disagreed, holding that State Farm breached the implied covenant of good faith and fair dealing:

We conclude that the duty applies to an excess insurer, just as it does to a primary insurer. We reject the notion that, simply because a condition precedent to a particular obligation—the obligation to pay—has not yet occurred, the insurer is relieved of the implied covenants that inhere in every contract.[38]

The court continued:

There was no doubt that the Schwartzes' claim would be covered by the State Farm policy once the primary insurer exhausted policy limits. As an excess insurer, State Farm, like any other insurer, was obliged under the implied covenant of good faith and fair dealing to do nothing to impair the Schwartzes' right to the benefits of the agreement. Payment in full to its other insured, the Weinsteins, might well impair those rights if that payment prevented the Schwartzes from receiving a fair share of benefits under the policy. That is for jury determination at trial.[39]

Other jurisdictions, using similar reasoning, have found breaches of the implied covenant of good faith and fair dealing based on conduct other than a failure to process or pay claims promptly. For example, in *Rawlings v. Apodaca*, the Arizona Supreme Court noted that, "[t]he implied covenant is breached, whether the carrier pays the claim or not, when its conduct damages the very protection or security which the insured sought to gain

---

35. 88 Cal.App.4th 1329, 106 Cal.Rptr.2d 523 (2001).

36. *Id.* at 526 (Internal citations omitted.).

37. *Id.* at 527.

38. *Id.* at 529.

39. *Id.* at 532.

by buying insurance." [40] In that case, the insurer withheld an investigative report that its insured needed to assert a claim against the tortfeasor, who was insured by the same carrier. *See, also: Union Bankers Ins. Co. v. Shelton,* 889 S.W.2d 278, 283 (Tex.1994) (holding that insurer breaches implied covenant of good faith and fair dealing when it cancels insured's health policy without reasonable basis.)

 Delaware, likewise, recognizes that the covenant ·of good faith and fair dealing implied in all contracts comprehends duties other than the duty to promptly process and pay claims. Our courts have held that the covenant also requires an insurer to notify its insured of the policy's limitations period if that time limit is shorter than the applicable State statute of limitations.[41] Similarly, an insurer may not deny coverage based on an insured's failure to give notice of a claim unless the insurer establishes that it was prejudiced by the lack of notice.[42] In sum, the implied covenant of good faith " 'is the obligation to preserve the *spirit* of the bargain rather than the letter, the adherence to *substance* rather than form....' " [43] It requires more than just literal compliance with the policy provisions and statutes. The implied covenant of good faith and fair dealing requires that the insurer act in a way that honors the insured's reasonable expectations.[44]

### D. State Farm's Conduct as Breach of the Implied Covenant

 The exhaustion provision in State Farm's policy, like the statute, expresses that UIM coverage is secondary, or excess, coverage that becomes payable after there is a determination that: (i) a third party was liable for the injuries sustained by the insured, (ii) the tortfeasor(s) vehicles were underinsured, and (iii) the insured has recovered on all available primary liability policies. Often the exhaustion requirement will protect the insurer from having to engage in expensive litigation to determine, for example, who is responsible for the accident or the extent of the insured's damages. In such circumstances, it would be reasonable to expect the insurer to invoke the exhaustion provision, and by doing so the insurer would not face potential liability for breaching the implied covenant of good faith and fair dealing. The covenant does not, after all, require an insurer to risk financial exposure in order to assist the insured.

 Nonetheless, although "the obligation of good faith does not require the insurer to relieve the insured of all possible harm that may come from his choice of policy limits, it does obligate the insurer not to take advantage of the unequal positions in order to become a secondary source of injury to the insured." [45] Here, it was inferable, if not apparent, from the pleaded facts that State Farm faced no possible financial exposure or prejudice if it agreed to waive the exhaustion requirement to enable Dunlap to settle with DART for $125,000 below its policy limits. State Farm was informed, and easily could verify, that Anne was not at all responsible for the accident and that her severe, permanent injuries would far exceed the total

---

**40.** 151 Ariz. 149, 726 P.2d 565, 573 (1986).

**41.** *Woodward v. Farm Family Casualty Ins. Co.,* 796 A.2d 638, 648 (Del.2002).

**42.** *State Farm Mut. Auto. Ins. Co. v. Johnson,* 320 A.2d 345 (Del.1974).

**43.** *Pierce v. Int'l. Ins. Co. of Illinois,* 671 A.2d at 1366 (Quoting 3A *Corbin on Contracts* § 654A (1994))(emphasis added).

**44.** *Ibid.*

**45.** *Rawlings v. Apodaca,* 726 P.2d at 573.

of all available policy limits. Thus, whether the Dunlaps received nothing or the full $300,000 policy limits from DART, State Farm still would have had to pay the $1 million limit of its UIM policy. It thus appears arguable that by refusing to agree to the $175,000 DART settlement, State Farm was not advancing any interest of its own, and had become a secondary source of injury to the Dunlaps.

■ Because the Dunlaps' claim may implicate a breach of State Farm's duty under the implied covenant of good faith and fair dealing, the dismissal of their complaint should be reversed and the case should be remanded to afford an Dunlaps the opportunity to plead a claim founded on the covenant. Just as an insurer may not rely on a notice provision to deny coverage except where it was prejudiced by the insured's lack of notice,[46] so, too, an insurer may not rely on an exhaustion provision absent a realistic risk of prejudice. In these circumstances, the Dunlaps may possibly have a claim that State Farm knew, or should have known, that the implied covenant of good faith and fair dealing required that it not arbitrarily prevent its own insured from obtaining the fullest possible recovery for her injuries where State Farm faced no realistic prejudice.[47] Nothing in this Opinion should be read as a "pre-approval" of any claim for breach of the implied covenant of good faith and fair dealing. Whether or not the Dunlaps are able to plead a legally cognizable claim must be determined in light of the specific allegations of whatever amended complaint (if any) that they file.

### Conclusion

Based on the foregoing, the judgment of the Superior Court is affirmed in part and reversed in part. This matter is remanded for further action in accordance with this opinion. Jurisdiction is not retained.

RIDGELY, Justice, concurring in part, dissenting in part.

I agree with and, therefore, concur in, the majority's conclusion that the Superior Court correctly dismissed the Dunlaps' bad faith claim against State Farm under *Tackett v. State Farm Fire & Cas. Ins. Co.*[48] The majority's opinion, however, ultimately describes a cause of action for the breach of the implied covenant of good faith and fair dealing that is semantically different but not substantively different from a *Tackett* claim, reverses the dismissal to the extent it is "with prejudice," and remands this case to allow the Dunlaps to amend their complaint. I disagree with the reversal and remand because the implied covenant does not come into play given the undisputed facts before us.

This Court has held that "implying obligations based on the covenant of good faith and fair dealing is a cautious enterprise."[49] We have said that in deference to the principle that, absent grounds for reformation, courts should not rewrite contracts.[50] The bottom line here is that the Dunlaps

---

**46.** *State Farm Mut. Auto. Ins. Co. v. Johnson,* 320 A.2d 345 (Del.1974).

**47.** *See, e.g.: Deese v. State Farm Mut. Auto. Ins. Co.,* 172 Ariz. 504, 838 P.2d 1265 (1992); *Campbell v. State Farm Mut. Auto. Ins. Co.,* 840 P.2d 130 (Utah Ct.App.1992); *State Farm Mut. Auto. Ins. Co. v. Shrader,* 882 P.2d 813 (Wyo.1994); *Zilisch v. State Farm Mut. Auto. Ins. Co.,* 196 Ariz. 234, 995 P.2d 276 (2000); *Schwartz v. State Farm Fire & Cas. Co., supra.*

**48.** 653 A.2d 254 (Del.1995).

**49.** *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.,* 708 A.2d 989, 992 (Del. 1998).

**50.** *Gertrude L.Q. v. Stephen P.Q.,* 466 A.2d 1213, 1217 (Del.1983).

wanted UIM coverage even though DART still had primary insurance coverage. If State Farm agreed to this, the policy would be rewritten and changed from uninsured/underinsured motorist coverage to a policy for primary insurance coverage. Because State Farm had no obligation to change the scope of the coverage under the policy, it did not breach the implied covenant when it refused the Dunlaps' request that it do so.

In *Tackett*, we held that a first-party claim against an insurer for bad faith denial or delay in claim payments sounds in contract, rather than tort.[51] We recognized that first-party insurance contracts, like any other contract, include an implied covenant of good faith and fair dealing.[52] We held that the implied covenant of good faith and fair dealing is breached when "an insurer fails to investigate or process a claim or delays payment in bad faith...."[53] We went on to state that "[a] lack of good faith, or the presence of bad faith, is actionable where the insured can show that the insurer's denial of benefits was 'clearly without any reasonable justification.'"[54]

The undisputed facts of this case show that State Farm was asked to consent to a settlement for less than the policy limits without prejudice to the Dunlaps' UIM claim.[55] The statute that provides for UIM insurance relieves State Farm of any obligation to pay "until after the limits of liability under *all* bodily injury bonds and insurance policies available to the insured at the time of the accident have been *exhausted* by payment of settlement or judgments."[56] In almost identical language, the Dunlaps' insurance policy stipulates that UIM coverage cannot be exercised by the insured until the limits of "*all* bodily injury liability bonds or policies that apply have been *used up* by payments of judgments or settlements."[57]

While the Dunlaps are not claiming that State Farm failed to investigate, process or delay payment on a claim, an analysis under *Tackett* of the alleged breach may be made on the premise that the *Tackett* list is merely representative and not exhaustive.[58] Thus, the Dunlaps have to show that State Farm's refusal to agree to a settlement with DART for less than policy limits clearly lacked any reasonable justification. In this case, the Dunlaps own agreement with State Farm prevents them from doing so. State Farm was reasonably justified in refusing the Dunlaps' request because the subject at issue was expressly covered by the contract. The DART policy had to be "used up" in order for the Dunlaps to have a UIM claim.

*Tackett* addresses the implied covenant of good faith and fair dealing in the context of an insurance contract. The case does so with a focus upon whether there is a *reasonable* justification for the insurer's position. Reasonable conduct is at the

---

51. *Tackett*, 653 A.2d at 265–66.

52. *Id.* at 264.

53. *Id.*

54. *Id.* (quoting *Casson v. Nationwide Ins. Co.*, 455 A.2d 361, 369 (Del.Super.Ct.1982)).

55. The Dunlaps attached to their complaint and incorporated within it by reference their counsel's and State Farm's correspondence on their request.

56. Del. Code Ann. tit. 18, § 3902(b)(3) (2005) (emphasis added).

57. State Farm Car Policy, 9808.4, Section III—Uninsured Motor Vehicle Coverage (emphasis added).

58. "A complete catalogue of types of bad faith is impossible." Restatement (Second) of Contracts § 205 comment d. (1981).

core of whether there has been a breach of the implied covenant of good faith and fair dealing. The implied covenant requires " 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain." [59] Here, the bargain was for uninsured/underinsured motorist coverage. The fruit of the bargain is payment under the terms of the UIM policy when no other insurance is available to the Dunlaps, not a settlement with DART.

We have stressed that the implied covenant of good faith and fair dealing exists to protect the "parties' reasonable expectations." [60] Under the statute and insurance policy at issue here, there could be no reasonable expectation that State Farm would provide uninsured motorist coverage for a motorist that was still insured. To the contrary, the expectations of the parties were that unless DART's policy was exhausted by settlement or judgment there could be no UIM claim. We should honor that bargained for expectation. The majority's point that DART's liability was "questionable" makes no difference. Disputes over liability are to be expected and a trial exists to resolve them. Because the undisputed nature of the Dunlaps request shows that the implied covenant of good faith and fair dealing does not come into play, it is my opinion that a remand to allow an amendment to the complaint is unwarranted. I respectfully dissent from the decision to reverse in part and remand.

---

**59.** *Majority Opinion* at —— (quoting *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del.Ch. 1985)).

**60.** *Cincinnati*, 708 A.2d at 992.